UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP 0 7 2017
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

_____

BRENDA CROUT, Temporary Administrator
of the Estate of Dale R. Crout, decedent,

          Plaintiff,

          v.

HAVERFIELD INTERNATIONAL, INC.,
doing business as Haverfield Aviation, Inc.,

          Defendant.

_____

**DECISION AND ORDER**

6:14-CV-06520 EAW

## INTRODUCTION

Plaintiff Brenda Crout ("Plaintiff") filed this wrongful death action on January 22, 2014, in the Supreme Court of New York, Kings County, relating to a tragic helicopter accident in which Dale R. Crout ("the decedent") and helicopter pilot Mackenzie Bleth ("Bleth") died. (Dkt. 1). Defendant Haverfield International, Inc. ("Defendant") removed the action to the Eastern District of New York on April 7, 2014. (*Id.* at 1-2).[1] The case was transferred to this Court by Stipulation and Order on September 9, 2014. (Dkt. 16).

---

[1] Although Defendant failed to remove the case within 30 days of its service (*see* Dkt. 1 at 6 (showing that the complaint was served on January 13, 2014)), as required by 28 U.S.C. § 1446(b)(1), removal was timely. The original complaint did not state the amount in controversy. (*See id.* at 7-12). Plaintiff served a supplemental demand "setting forth the total damages to which [P]laintiff deems herself entitled in this action," as $45,000,000.00 on March 20, 2014. (*Id.* at 24). Where the complaint fails to assert an amount in controversy, "the time for removal runs from the service of the first paper stating on its face the amount of damages sought." *Moltner v. Starbucks Coffee Co.*, 624 F.3d 34, 35 (2d Cir. 2010). Defendant filed a notice of removal 18 days after service of Plaintiff's damages demand. (*See* Dkt. 1). Thus, removal was timely.

Presently before the Court are cross-motions for partial summary judgment. (Dkt. 36; Dkt. 42). Plaintiff seeks summary judgment on the issue of Bleth's negligence (and thereby Defendant's vicarious liability), and for dismissal of Defendant's affirmative defense of the decedent's comparative negligence. (Dkt. 39). Defendant seeks summary judgment on the applicable standard of care for Bleth's negligence, and as to Plaintiff's claim for negligent hiring and training. (Dkt. 43).

For the reasons stated below, Plaintiff's motion for partial summary judgment (Dkt. 36) is denied, and Defendant's motion for partial summary judgment (Dkt. 42) is granted.

## **FACTUAL BACKGROUND**[2]

On the morning of November 15, 2012, shortly before noon, a helicopter owned by Defendant, piloted by Bleth, and carrying the decedent took off on the second of three days of planned flights to inspect power lines in the vicinity of Corning, New York. (Dkt. 39 at 3; Dkt. 44 at ¶¶ 5-8, 11).

In control of the aircraft was Bleth, a 24-year-old pilot Defendant hired less than a month prior. (Dkt. 38 at ¶¶ 24-25). Bleth held appropriate "FAA licenses and certifications" to fly the helicopter. (Dkt. 44 at ¶ 13). Bleth and the decedent—a First Class Linesman for New York State Electric and Gas Corporation—were tasked with doing a "powerline patrol," which "requires a helicopter to fly close to wires, towers and utility structures," generally at speeds between 30 and 45 knots. (Dkt. 38 at ¶¶ 5, 11, 58; Dkt. 52 at 3). Powerline patrol is a high-risk job. (Dkt. 38 at ¶ 17; Dkt. 52 at 5).

---

[2]       The facts presented here are undisputed unless otherwise noted.

Bleth's first day flying powerline patrol had been the previous day, November 14, 2012, during which he and the decedent had completed 6.2 hours of aerial inspections. (Dkt. 38 at ¶ 73). Before this first powerline mission, Defendant provided Bleth with 2.1 hours of total flight training, and 27.2 hours of ground training. (*Id.* at ¶¶ 27, 70; Dkt. 52 at 7). Defendant released Bleth to fly powerline patrol on November 9, 2012. (Dkt. 38 at ¶ 40; Dkt. 52 at 10).

The decedent had performed inspections on the same powerlines in 2009, 2010, and 2011, and was "more than proficient" in reading a powerline map. (Dkt. 38 at ¶ 63; Dkt. 52 at 25; Dkt. 59 at 8). The November 15, 2012, flight was operated pursuant to 14 C.F.R. Part 91. (Dkt. 38 at ¶ 20; Dkt. 52 at 6; *see, e.g.*, Dkt. 37-4 at 2 (National Transportation Safety Board's ("NTSB") report stating that "[t]he aerial observation flight was conducted under the provisions of 14 Code of Federal Regulations Part 91"); Dkt. 37-21 at 2 (same)).

For context, a description of the construction of power transmission wire systems is necessary. A wire or series of wires that runs perpendicular to another set of wires is called a "tap" line. (Dkt. 38 at ¶ 50; Dkt. 52 at 12). A shield wire, which protects power transmission lines from lightning strikes, generally runs along the top of the towers. (Dkt. 38 at ¶ 8; Dkt. 52 at 12). The shield wire is typically smaller than power transmission wires and can be more difficult to observe. (Dkt. 38 at ¶ 49; Dkt. 52 at 12). During powerline patrol, a pilot should anticipate that there is a shield wire, even if he cannot see one. (Dkt. 38 at ¶ 53; Dkt. 52 at 12). Transmission and static lines are, at times, difficult to see, and can be invisible, during powerline patrol. (Dkt. 52 at 22; Dkt.

59 at 1). The visibility of a wire can change from moment to moment. (Dkt. 52 at 23; Dkt. 59 at 2).

Defendant requires its pilots and passengers to attend a safety briefing, called a "tailboard," before takeoff. (Dkt. 38 at ¶ 42; Dkt. 52 at 11). During the tailboard, the pilot and the inspector discuss the powerline transmission map for the lines they plan to inspect. (Dkt. 38 at ¶ 43).[3] Defendant requires details of the tailboard to be recorded in a document and signed by each person in the helicopter. (*Id.* at ¶ 42; Dkt. 52 at 11). No such document has been recovered or produced for the November 15, 2012, flight. (Dkt. 38 at ¶ 46; Dkt. 52 at 11).

The November 15, 2012, flight took off at 11:49 AM. (Dkt. 38 at ¶ 75; Dkt. 52 at 17). At 12:11 PM, the vertical strut on the helicopter's right landing skid struck a shield wire on a tap line 96 feet above the ground. (Dkt. 38 at ¶¶ 77, 83; Dkt. 52 at 18-19). The helicopter had been flying at approximately 43 knots in level flight. (Dkt. 38 at ¶ 79; Dkt. 52 at 18). The impact with the tap line caused the helicopter to crash, killing both Bleth and the decedent. (Dkt. 44 at ¶ 11; Dkt. 49 at 4). The helicopter ignited once it hit the ground. (Dkt. 37-4 at 2). Neither weather nor any mechanical issue caused the crash. (Dkt. 38 at ¶¶ 89-90; Dkt. 52 at 19-20).

There is no transcript or any recording of the communications between Bleth and the decedent during the November 15, 2012, flight. (Dkt. 38 at ¶ 94; Dkt. 52 at 20).

---

[3]     Defendant objects to this characterization, contending that at the tailboard, "it is the obligation of the inspector to advise the pilot of the crossing lines." (Dkt. 52 at 11). This distinction is immaterial to the Court's analysis.

# DISCUSSION

## I.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.  Federal Preemption

Untangling the issues in this case begins with a determination as to the existence and extent of federal preemption of state and common law in relation to the applicable safety standards.  Defendant asserts that the federal government, through the Federal Aviation Act of 1958, 49 U.S.C. §§ 1301 *et seq.* ("FAA"), preempted the entire field of aviation safety.  (Dkt. 43 at 9-13).  Plaintiff asserts that federal preemption of state and

common law does not reach the issues in this case, and, as such, the Court must look to industry and state standards in determining the merits. (Dkt. 48 at 10-19).

The Supremacy Clause of the United States Constitution instructs that the Constitution and laws of United States are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2. "[S]tate and local laws that conflict with federal law are 'without effect.'" *N.Y. SMSA Ltd. P'ship v. Town of Clarkson*, 612 F.3d 97, 103 (2d Cir. 2010) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

> In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, "where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law"; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives.

*Id.* at 104 (citation omitted). Congress's intent is key to determining preemption. *Altria Grp.*, 555 U.S. at 76. "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* at 76-77.

"The United States Government has exclusive sovereignty of airspace of the United States." 49 U.S.C. § 40103(a)(1). "The FAA was enacted to create a 'uniform and exclusive system of federal regulation' in the field of air safety." *Air Trans. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 224 (2d Cir. 2008) (citation omitted). "[T]he FAA 'was passed by Congress for the purpose of centralizing in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's

airspace.'" *Id.* (citing *Air Line Pilots Ass'n, Intern. v. Quesada*, 276 F.2d 892, 894 (2d Cir. 1960)); *see, e.g., French v. Pan Am Exp., Inc.*, 869 F.2d 1, 5 (1st Cir. 1989) ("[The] establishment of a single uniform system of regulation in the area of air safety was one of the primary 'objects sought to be obtained' by passage of the [FAA]."); *Kohr v. Allegheny Airlines*, 504 F.2d 400, 404 (7th Cir. 1974) ("[T]he principal purpose of the Act is to create one unified system of flight rules and to centralize in the Administrator of the Federal Aviation Administration the power to promulgate rules for the safe and efficient use of the country's airspace."). The Second Circuit has held that "Congress intended to occupy *the entire field* of air safety. . . ." *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 210 (2d Cir. 2011) (emphasis added). Thus, the law of this Circuit is that field preemption applies in the area of air safety. *Id.*

Once Congress's intent is established, the court must look to the scope of the preemption to determine whether "the state regulation sufficiently interferes with federal regulation [such] that it should be deemed preempted." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 107 (1992); *see, e.g., Goodspeed Airport*, 634 F.3d at 210-11 ("[T]he inquiry is twofold; we must determine not only Congressional intent to preempt, but also the scope of that preemption."). Even where an entire field is preempted, if the state laws at issue do not interfere with federal laws and regulations, the state laws are not preempted. *Goodspeed Airport*, 634 F.3d at 211.

## III.   Defendant's Vicarious Liability

Plaintiff alleges that Defendant is vicariously liable for Bleth's actions. Even though the FAA preempts state law in the field of air safety, Plaintiff may still seek remedies based on state law pursuant to the FAA's savings clause. *See* 49 U.S.C. § 40120(c) ("A remedy under [the FAA] is in addition to any other remedies provided by law."); *see, e.g., Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 58 (2d Cir. 2006) ("This 'saving' clause clearly indicates that the [FAA's] remedies are not intended to be exclusive and that the [FAA] therefore does not itself preempt [the plaintiff's] claims for state-law remedies for violations of the FAA regulations.").

Under New York law, "[t]he doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment." *Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 933 (1999); *see, e.g., Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979). There is no dispute that Bleth was an employee acting in the scope of his employment at the time of the fatal crash. (*See* Dkt. 38 at ¶¶ 23, 69; Dkt. 52 at 6, 16). Thus, if Bleth committed a tort, Defendant is liable.

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (quoting *Solomon ex rel. Solomon v. City of N.Y.*, 66 N.Y.2d 1026, 1027 (1985)).

Plaintiff argues that Bleth's negligence can be determined as a matter of law. (Dkt. 39 at 15-19).

## A.    **Standard of Care**

Defendant argues that the federal regulations set the standard of care for a pilot because they preempt the state law standard of care, and that a jury is required to determine whether Bleth's actions met the federal standard. (Dkt. 43 at 20-21). Although Plaintiff does not address the standard of care in its motion for summary judgment (*see* Dkt. 39 at 15-19), Plaintiff seems to concede that—at least for the vicarious liability claim—the federal standard of carelessness or recklessness applies to Bleth's actions. (*See* Dkt. 48 at 12).

Air safety regulations under the FAA are set out in the Federal Air Regulations, 14 C.F.R. §§ 21.199 *et seq.* ("FARs"). FAR 91.3 declares that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3(a). FAR 91.13 sets the standard of care for a pilot in operation of an aircraft. *See id.* § 91.13. "No person may operate an aircraft in a *careless or reckless manner* so as to endanger the life or property of another." *Id.* § 91.13(a) (emphasis added). In contrast, the negligence standard under New York state law requires that a person act as a reasonably prudent person would under the same or similar circumstances. *See Havas v. Victory Papers Stock Co., Inc.*, 49 N.Y.2d 381, 385 (1980).[4]

---

[4]    At oral argument, Plaintiff's counsel suggested that the state standard of a reasonably prudent person and the federal standard of recklessness or carelessness are not effectively different in application.

The Second Circuit held in *Goodspeed Airport* that the FARs preempted the entire field of state and local regulations in relation to air safety. *Goodspeed Airport*, 634 F.3d at 210. The New York state standard of care for negligence impinges on the federal standard of care set out in FAR 91.13 in that New York state has a "reasonable person" standard, and the FARs set the standard as carelessness or recklessness. This presents a conflict between the federal and state standards. As such, the federal standard of care preempts the application of the New York state standard. *In re Air Crash Near Clarence Ctr., N.Y., on Feb. 12, 2009*, 798 F. Supp. 2d 481, 486 (W.D.N.Y. 2011) [hereinafter *In re Air Crash I*] ("[T]he [FAA] and its accompanying federal regulations preempt state regulation of the air safety field, including state standards of care."); *see, e.g., Aldana v. Air E. Airways, Inc.*, 477 F. Supp. 2d 489, 493 (D. Conn. 2007) (applying federal standard of care to state negligence claims arising out of airplane crash); *Shupert v. Cont'l Airlines, Inc.*, No. 00 Civ. 2743(LLM), 2004 WL 784859, at *6 (S.D.N.Y. Apr. 12, 2004) (applying the federal standard of care to state law claims involving air safety). Thus, the standard which applies to Bleth's operation of the aircraft is the federal one—carelessness or recklessness.

**B.    The Carelessness or Recklessness of Bleth's Actions Must be Determined by a Jury**

Plaintiff argues that there is no issue of material fact as to Bleth's negligence, and, therefore, Defendant's liability. (Dkt. 39 at 15-19). Defendant asserts that there are issues of material fact as to whether Bleth was operating the helicopter carelessly or recklessly at the time of the accident. (Dkt. 51 at 15-20).

A pilot is directly responsible for and the final authority as to the operation of an aircraft. 14 C.F.R. § 91.3(a). "This includes a duty to see what can be seen, and to separate his aircraft from obstructions and hazards. . . ." *Safeco Ins. Co. of Am. v. City of Watertown, S.D.*, 529 F. Supp. 1220, 1230-31 (D.S.D. 1981). A pilot is also required to "become familiar with all available information concerning the flight" before takeoff. 14 C.F.R. § 91.103. However, despite these requirements, a pilot is not automatically negligent as a matter of law solely because a crash occurs. *Foss v. United States*, 623 F.2d 104, 106-07 (9th Cir. 1980); *see, e.g.*, *Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1447 (5th Cir. 1990) ("Without more, the fact that two airplanes collide in mid-air . . . is not evidence of negligence on the part of both pilots or of negligence on the part of one, but not the other, pilot. The duty imposed upon pilots by the regulation is a duty to exercise vigilance so as to see and avoid other aircraft; it is not an absolute duty to see and avoid.").

Defendant's Vice President of Operations, Robert Bohner ("Bohner") testified that the crash "occurred as a result of pilot error." (Dkt. 37-3 at 30). Bohner later testified that he concluded that the crash was caused by pilot error because "the helicopter flew into the wire." (*Id.* at 32). Defendant's expert witness, William J. Edwards ("Edwards"), testified that "crew error" was the cause of the crash, thereby blaming both Bleth and the decedent. (Dkt. 37-8 at 45-46).

Plaintiff argues that the above testimony establishes that Bleth was negligent as a matter of law. (Dkt. 58 at 9). The Court disagrees. Even assuming pilot error was the sole cause of the crash, it cannot be said as a matter of law that Bleth was careless or

reckless in the operation of the helicopter. An error must rise to the level of carelessness or recklessness to constitute a breach of the applicable standard of care. It is undisputed that shield wires, like the one that the helicopter struck, can be difficult, if not impossible, to see, and that the visibility can change from moment to moment. Additionally, Defendant has put forth evidence that the shield wire may have been nearly invisible to Bleth (and the decedent) right before impact. (Dkt. 55 at ¶¶ 6-9). Thus, while it may be undisputed that the accident was caused by Bleth's error in the operation of the helicopter, there are disputed issues of material fact as to whether that error rose to the level of carelessness or recklessness.

Plaintiff relies on two cases to support her claim for summary judgment: *American Eagle Insurance Co. v. Rutland Area Flyers, Inc.*, 949 F. Supp. 243 (D. Vt. 1996), and *Stokes v. Petroleum Helicopters, Inc.*, No. CIV.A. 97-0508, 1998 WL 751635 (E.D. La. Oct. 26, 1998). The *American Eagle* court granted summary judgment on the issue of a pilot's negligence in a plane crash, primarily based on the testimony of an eyewitness—a survivor of the crash who was in the plane before and during the crash. *Am. Eagle*, 949 F. Supp. at 248. That court, on the basis of eyewitness testimony, equated pilot error with negligence. *See id.*

*Stokes* arose from a helicopter crash into the Gulf of Mexico in which all passengers survived uninjured, and the pilot admitted that he was unable to control the aircraft on takeoff, leading to the crash. *Stokes*, 1998 WL 751635, at *1-3. Although the pilot also testified that his takeoff procedure was proper, he failed to "offer any explanation as to why he believe[d] that his takeoff technique was proper. . . ." *Id.* at *3.

The pilot's self-serving testimony also contradicted his employer's and the Federal Aviation Administration's conclusions as to his takeoff technique. *Id.* Thus, "based on the pilot's own testimony and [his employer's] findings" the court found that summary judgment on the pilot's negligence was appropriate. *Id.*

Here, by contrast, there is no record of what went on in the cockpit of the helicopter during the fatal flight. There is also no record of the tailboard briefing. The Court disagrees with the *American Eagle* court that a pilot error equates with negligence *per se*, especially under the federal standard of care. Pilot error could cause a fatal crash without rising to the level of carelessness or recklessness.

Even though Plaintiff claims that she "does not rely on the crash to prove negligence," in fact, she does. (*See* Dkt. 58 at 9). Plaintiff may be correct that "there is no evidence in this record from which a reasonable jury could conclude that Bleth was blameless in this crash." (*See id.*). It does not follow that Bleth was careless or reckless in operating the helicopter. A reasonable jury could find that the fatal error by Bleth was the product of his failing to see and avoid the strike line, which may have been virtually invisible on that fateful afternoon, not carelessness or recklessness. An issue of material fact remains: whether Bleth breached his duty of care by operating the helicopter in a careless or reckless manner. This issue is for the jury—and the jury alone—to decide.

## IV. Defendant's Liability for Negligent Training and Hiring

Defendant seeks summary judgment on Plaintiff's negligent hiring and training claims. (Dkt. 43 at 13-20). Defendant argues that the FAA and the FARs preempt any state or common law standards as to Bleth's hiring or training, and, because Bleth was

qualified to fly helicopters under the FAA and FARs, summary judgment is appropriate. (*Id.*). Plaintiff argues that the FAA and FARs are silent on hiring and training as related to flying in the wire environment, and, therefore, the gaps can be filled by reference to other standards of care. (Dkt. 48 at 10-19).

### A. The FARs Preempt Hiring and Training Requirements Set by State Law or Industry Custom

As noted above, "Congress intended to occupy *the entire field* of air safety and thereby preempt state regulation of that field." *Goodspeed Airport*, 634 F.3d at 210 (emphasis added). Hiring, training, and supervision "directly implicate air safety." *In re Air Crash I*, 798 F. Supp. 2d at 485; *see, e.g.*, *In re Air Crash Near Clarence Ctr., N.Y.*, No. 09-md-2085, 2013 WL 5964480, at *3 (W.D.N.Y. Nov. 8, 2013) [hereinafter *In re Air Crash II*] ("Plaintiffs' negligent hiring, training, and supervision claims directly implicate air safety." (internal citation omitted)). "Consequently, . . . negligent hiring, training, selection, and supervision claims are subject to the standards of care contained in the specific federal regulations that may apply. . . ." *In re Air Crash II*, 2013 WL 5964480, at *5.

The federal regulations include extensive requirements for the training of commercial helicopter pilots. *See generally* 14 C.F.R. Part 61. A pilot must have a license and pass a medical examination. *Id.* § 61.3. Commercial helicopter pilots are required to show aeronautical knowledge, *id.* § 61.125, and in-flight proficiency, *id.* § 61.127(b)(3). To qualify for a commercial flying license, they are also required to log

at least 150 hours of flight time, including 100 hours of pilot-in-command time and at least 10 hours of solo flight time in a helicopter. *Id.* § 61.129(c).

The FARs also include restrictions on hiring helicopter pilots. Commercial operators cannot "use any person as an airman" unless that person holds the appropriate FAA license, the person has his license and medical certificate in his possession during the operations, and the person "is otherwise qualified for the operation for which he is to be used." *Id.* § 121.383; *see also id.* § 121.1(a) (stating that the requirements apply to any commercial operator under 14 C.F.R. Part 119); *id.* § 119.25 (applying operating requirements to "[e]ach person who conducts rotorcraft operations for compensation or hire").

*Goodspeed Airport* dictates the result here. The Second Circuit, joining its sister courts, held that Congress intended to preempt the entire field of air safety regulations, thereby displacing any and all state and common law which touches or bears upon air safety. One of the more important issues to air safety is plainly the hiring and training of pilots.

Plaintiff argues that even though *Goodspeed Airport* clearly held that air safety regulations are set by federal law, the Court should look to state or industry standards because there are no federal regulations regarding the hiring and training of pilots for flying near wires. (Dkt. 48 at 16-19). Plaintiff's reading of *Goodspeed Airport* eviscerates that court's holding and cannot stand.

The state regulations at issue in *Goodspeed Airport* prohibited the removal of vegetation and trees in wetlands without a permit. *Goodspeed Airport*, 634 F.3d at 208.

There was a possible conflict with federal law because the FARs require removal of obstructions around regulated runways. *Id.* The *Goodspeed Airport* court held that the state environmental regulations at issue did not sufficiently interfere with the federal laws such that they were preempted. *Id.* at 211. Key to its holding was that the local regulation did not directly intrude on the preemptive air safety regulations. *Id.* Further, the permitting process required by local law was not a total ban on tree removal. *Id.* "The state laws at issue . . . [did] not enter the scope of the preempted field in either their purpose or their effect." *Id.*

That is not the case here. As is noted above, the FAA was intended to centralize "in a single authority—indeed, in one administrator—the power to frame rules for the safe and efficient use of the nation's airspace." *Quesada*, 276 F.2d at 894; *see also Ventress v. Japan Airlines*, 747 F.3d 716, 722 (9th Cir. 2014) ("[B]y inviting the factfinder to pass on questions of pilot qualification and medical fitness, [the plaintiff's] state law claims impinge on Congress's goal of ensuring 'a single, uniform system for regulating aviation safety.'" (citation omitted)). To allow a patchwork of state law and industry regulations for pilot hiring and training would strip bare Congress's intent in passing the FAA. The state law and industry customs Plaintiff seeks to impose clearly enter the scope of the preempted field of pilot hiring and training standards, and, as such, are preempted by federal law. *See Goodspeed Airport*, 634 F.3d at 210; *see, e.g.*, *Ventress*, 747 F.3d at 721-22 ("Our review of the applicable FARs confirms that pilot qualifications and medical standards for airmen . . . are pervasively regulated. . . . [W]e conclude that the FAA and accompanying FARs preempt [the plaintiff's state law]

claims."); *French*, 869 F.2d at 4 (holding that the FAA and FARs "afford[] no room for the imposition of state-law criteria vis-a-vis pilot suitability" for "the medical standards which an airline pilot must meet before he will be certified"); *In re Air Crash I*, 798 F. Supp. 2d at 485-86; *see also In re Sept. 11 Litig.*, 811 F. Supp. 2d 883, 891 (S.D.N.Y. 2011) ("The statutory mandate for uniformity is inconsistent with [the p]laintiff's argument that state law should be considered along with federal regulations." (citing *In re Air Crash I*, 798 F. Supp. 2d at 485-86)).

Congress (or the Federal Aviation Administration) could require additional training for pilots to work in the wire environment, as required for sport pilots and airline transport pilots. *See* 14 C.F.R. Part 61, Subparts G & J. Special restrictions on flights in the wire environment could be implemented, as they have been for aerobatic flights, parachuting operations, and the towing of other aircraft. *See id.* §§ 91.303, 91.307, 91.309, 91.911. Specialized training could be required for the type of aircraft used for wire inspection flights, as has been required for the Mitsubishi MU-2B. *See id.* §§ 91.1707 *et seq.* But neither Congress nor the Federal Aviation Administration has implemented these requirements for the wire environment. Congress preempted the entire field of air safety, but chose not to include any special requirements for flights in the wire environment. The federal commercial helicopter pilot hiring and training standards are the standards Defendant is required to meet. Perhaps it would be advisable for Congress or the Federal Aviation Administration to add special training requirements for flights in the wire environment, given the risk of such flights. (*See* Dkt. 38 at ¶ 17; Dkt. 52 at 5). However, that is not a matter for this Court to decide.

Plaintiff attempts to distinguish *In re Air Crash II* by stating that the regulations in that case "were so comprehensive as to be deemed to completely replace [state law]." (Dkt. 48 at 16). Such is the case here as well. Although the federal regulations do not require different or additional training for any and every scenario in which a helicopter pilot may fly—as Plaintiff desires—this does not diminish the fact that the federal regulations comprehensively detail training, licensing, and hiring requirements for commercial helicopter pilots.

Plaintiff also points to out-of-circuit caselaw to support her argument that this Court should look to state law and industry practices regarding Bleth's hiring and training. (Dkt. 48 at 17-18 (citing *Martin v. Midwest Express*, 555 F.3d 806 (9th Cir. 2009); *Monroe v. Cessna*, 417 F. Supp. 2d 824 (E.D. Tx. 2006); *Damien v. Bell Helicopter*, 352 S.W.3d 124 (Tex. Ct. App. 2011)). None of these cases deal with hiring or training requirements, and, as such, provide no persuasive authority for Plaintiff's proposition. *See Martin*, 555 F.3d at 808 (dealing with a defective products claim); *Monroe*, 417 F. Supp. 2d at 826-27 (same); *Damien*, 352 S.W.3d at 132-38 (same). Further, to the extent that those cases conflict with *Goodspeed Airport*'s clear holding that the FARs preempt state law regarding air safety, this Court is bound by the law in this Circuit.

## B. Plaintiff Has Not Established an Issue of Material Fact as to Bleth's Hiring and Training

Defendant argues that Plaintiff failed to identify any FAR violations relating to Bleth's hiring or training. (Dkt. 43 at 16-20). Defendant submitted Federal Aviation

Administration-certified copies of Bleth's: private pilot rotorcraft helicopter course graduation certificate dated February 8, 2007 (Dkt. 46-2 at 3); private Temporary Airman Certificate with "Rotorcraft Helicopter" rating dated February 12, 2007 (Dkt. 46-3 at 3); commercial Temporary Airman Certificate with "Rotorcraft-Helicopter" rating dated May 11, 2007 (Dkt. 46-4 at 3); commercial Temporary Airman Certificate with "Rotorcraft Helicopter; Instrument Helicopter" rating dated February 19, 2010 (Dkt. 46-6 at 3); Special Medical Flight Test Report dated December 1, 2008 (Dkt. 46-5 at 3); and Medical Certificate Second Class dated March 27, 2012 (Dkt. 46-7 at 3). Edwards states that "Bleth met all of the FAA's requirements to pilot the mission he was assigned on the day of the incident." (Dkt. 46 at ¶ 9). Plaintiff's expert testified that Bleth was appropriately licensed by the FAA to fly the mission on the day of the accident. (Dkt. 45-7 at 23).

Bleth undoubtedly held the required federal helicopter license and medical certification to fly the doomed mission on November 15, 2012. Plaintiff does not argue otherwise. Because of this, and because the federal regulations preempt any and all state law and industry standards, there is no issue of material fact upon which a rational jury could find for Plaintiff with respect to Defendant's alleged negligence in Bleth's hiring and training. Thus, summary judgment is appropriate with respect to Plaintiff's negligent hiring and training claim.[5]

---

[5] To be clear, the Court is <u>not</u> suggesting that Bleth's lack of experience cannot be relied upon by Plaintiff at trial in an attempt to prove that Bleth acted in a careless or reckless manner. Rather, it is simply concluding that Bleth's experience deficiencies do

## V.    Defendant's Affirmative Defense Based on the Decedent's Comparative Negligence

Plaintiff also seeks summary judgment on Defendant's affirmative defense that the decedent was partially culpable for the accident. (Dkt. 39 at 19-25). Plaintiff argues that the decedent had no legal duty to avoid the wire, and that even if such a duty existed, there is no evidence that the duty was breached, or that the breach was the proximate cause of the crash. (*Id.*). Defendant argues that the decedent owed a duty of care to himself, that he breached the duty, and that the decedent's failure to warn Bleth about the tap line was the proximate cause of the crash. (Dkt. 51 at 22-29).

Under New York law, in actions for wrongful death

> the culpable conduct attributable to . . . the decedent, including contributory negligence . . . shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the . . . decedent bears to the culpable conduct which caused the damages.

N.Y. C.P.L.R. 1411; *see, e.g., Ahluwalia/Shetty v. Kidder, Peabody & Co., Inc.*, 173 F.3d 843 (Table), at *1 (2d Cir. 1999) ("Under New York law, any tort damage award must be reduced by the percentage of fault attributable to the plaintiff's negligence."). "The question of contributory negligence ordinarily is a question of fact. It is only when there is no dispute upon the facts and only one conclusion can be drawn therefrom that it may be decided as a question of law." *Nelson v. Nygren*, 259 N.Y. 71, 75 (1932); *see, e.g., Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 516-17 (1980) ("[W]e have often said

---

not support a negligent hiring or training claim where the hiring and training requirements set forth in the FAR were satisfied.

that the question of contributory negligence is almost always a question of fact and is almost exclusively a jury function. We have also observed, however, that contributory negligence should not be charged if there is no or insufficient evidence to support it." (internal quotation marks and citations omitted)); *Rendon v. Goldner*, 283 F.2d 881, 882 (2d Cir. 1960).

## A. The Decedent's Alleged Legal Duty to Himself

Plaintiff claims that the decedent had no legal duty to avoid the wire, and, because he had no duty, he cannot be found negligent as a matter of law. (Dkt. 39 at 20-22). Defendant argues that the decedent had a legal duty to himself to take reasonable measures to ensure his own safety. (Dkt. 51 at 22-28).

No case in New York has recognized an aircraft passenger's legal duty owed to himself. However, New York recognizes that a passenger in a vehicle has a duty to take care to avoid injury, including, when appropriate, by warning the person operating the vehicle. As explained by the New York Court of Appeals:

> The question is not whether the guest should protest against fast driving, call attention to apprehended danger, or demand that the car be stopped so that he could get out. The legal question is whether, under the circumstances, he acted with the care that a reasonably prudent man would have used under the circumstances.

> Who is to answer that question, the court or the jury? We believe it is for the jury to determine.

*Nelson*, 259 N.Y. at 75-76 (applying contributory negligence principles to the passenger in a car); *see also Brickell v. N.Y. Cent. & Hudson River R.R. Co.*, 120 N.Y. 290, 293 (1890) ("It is no less the duty of the passenger, where he has the opportunity to do so,

than of the driver, to learn of danger and avoid it if practicable."); *Hoag v. N.Y. Cent. & Hudson River R.R. Co.*, 111 N.Y. 199, 203 (1888) (holding that the passenger in a horse-drawn carriage that was hit by a train "was bound to look and listen. . . . She had no right because her husband was driving to omit some reasonable and prudent effort to see for herself that the crossing was safe."); *Posner v. Hendler*, 302 A.D.2d 509 (2d Dep't 2003) ("A passenger in a vehicle is required to exercise reasonable care for his or her own safety."); *see, e.g.*, Restatement (Second) of Torts § 495 (Am. Law Inst. 1960) ("[I]f the plaintiff knows that at a particular point there will be a peculiar danger, which he has no reason to believe that the driver if unaided will perceive, the plaintiff may be negligent if he does not keep himself in a position to call the danger to the attention of the driver.").

Again, the Court is unable to find any New York caselaw suggesting that such a duty applies in the aviation context, and Defendant cites none. Courts applying other states' law and the common law have reached differing results on whether a passenger in an aircraft has a duty to himself. *See Long v. Clinton Aviation Co.*, 180 F.2d 665, 669 (10th Cir. 1950) (finding that a passenger in a plane had a duty to warn under Colorado law); *Larson ex rel. Estate of Truesdell v. Era Aviation, Inc.*, No. A00-0121CVJKS, J0-0014CV, A00-0194CV, A00-0381CV, 2003 WL 22113469, at *5 (D. Alaska Sept. 11, 2003) ("[C]ourts have found a common law duty of ordinary care for a passenger in a plane in the face of a known danger." (citing *Long*, 180 F.2d at 669)); *Remo v. U.S. Fed. Aviation Auth.*, 852 F. Supp. 357, 364 (E.D. Pa. 1994) ("[T]he duty to see and avoid is imposed not only upon the pilot-in-command of an aircraft, but also upon other persons in a position to look outside of the aircraft for potentially conflicting aircraft."). *But see*

*In re Greenwood Air Crash*, 924 F. Supp. 1511, 1517-18 (S.D. Ind. 1995) (finding no duty to see and avoid falls upon a passenger in an airplane, and pointing out that the *Remo* court "cites no law for such a proposition" and that "the statement is wholly collateral to the issues in that case").

Defendant argues that the passenger's duty applies under New York law in the aviation context. (*See* Dkt. 51 at 23-26). That argument appears persuasive, at least in the context of this case. The duty was applied first to passengers in horse-drawn carriages. *See Hoag*, 111 N.Y. at 203. The New York Court of Appeals then applied the duty to passengers in automobiles. *Nelson*, 259 N.Y. at 76. At least one lower state court has applied the duty to a passenger on a motorcycle. *Luck v. Tellier*, 222 A.D.2d 783, 785 (3d Dep't 1995). The passenger's duty has evolved in New York to include each new form of transportation. Although the New York Court of Appeals has not spoken on the issue of whether a passenger in an airplane or helicopter has a duty of care, there is a strong argument that the Court of Appeals would likely hold that a passenger in an airplane or helicopter has a duty to himself where the passenger knows or should know of a particular danger and has the ability to warn the pilot of the danger. *See Comm'r of Internal Revenue v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (requiring federal courts to "apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State" when the state's highest court has not spoken on an issue of state law). Recognition of such a duty certainly comports with the great weight of courts interpreting other states' laws and the common law, and with the general conclusion of the Restatement of Torts.

However, even if New York recognized a legal duty of an aircraft passenger to himself, it is not clear whether such a state standard is preempted by federal law—as is the case of the duty imposed on the aircraft operator. Without citing any case law, Plaintiff asserts that the federal standard applies to the decedent, as it does for Bleth. (Dkt. 58 at 12-13). As described above, federal preemption applies only where state law infringes on federal law. *Goodspeed Airport*, 634 F.3d at 211. Although the FARs apply "to each person on board an aircraft being operated under [Part 91], unless otherwise specified," 14 C.F.R. § 91.1(c), the standard of care, by its terms, applies only to those persons operating the aircraft. 14 C.F.R. § 91.13(a) ("No person may *operate an aircraft* in a careless or reckless manner so as to endanger the life or property of another." (emphasis added)). There does not appear to be any corresponding standard for passengers. *See* 14 C.F.R. Part 91; *see, e.g.*, *Larson*, 2003 WL 22113469, at *3 (stating that FAA regulations regarding the duty of care do not apply to a passenger). Although not raised by either party, there could be an argument that if Plaintiff was classified as a crewmember, the FARs would regulate his conduct. *See, e.g.*, 14 C.F.R. § 91.17 (requirements with respect to use of alcohol or drugs by crewmembers). Moreover, the Court questions the appropriateness of the legal conclusion that—because a passenger's duty of care is not expressly addressed by the FARs—Bleth's standard of care would be judged under a federal standard but the corresponding standard imposed on the decedent (and possibly utilized to diminish Bleth's culpability) would be set by a state standard. Indeed, a passenger's duty could arguably change as an aircraft passed through the

airspace of different states—a hodgepodge result that the FAA was designed to avoid. *See Cuomo*, 520 F.3d at 225; *Babcock v. Jackson*, 12 N.Y.2d 473, 480 (1963).

At this stage of the litigation, based on the record before the Court and the limited legal authority addressing the issue, the Court cannot state as a matter of law that the decedent owed no duty to himself, nor can the Court safely conclude that the New York standard of care applies and imposed a duty on the decedent to himself.

If New York law does impose such a duty, and if that state standard applies in this case, there would be issues of fact precluding summary judgment with respect to Defendant's comparative negligence affirmative defense. In other words, there is sufficient information in the record for a rational jury to find that the decedent knew of the danger posed by the tap line, and that he could have warned Bleth about the tap line before the crash. It is not pure speculation or conjecture to find such information, as Plaintiff argues. (*See* Dkt. 39 at 22). The undisputed facts establish that the decedent had inspected the exact power lines he was inspecting on the day of the accident three times previously. The decedent was highly proficient in reading a powerline map, and, according to the decedent's supervisor, would have had the same map during the fatal flight that he had used in earlier years. (*See* Dkt. 37-12 at 7-8). The fact that the decedent was familiar with the power lines in the area and he had with him or had access to a map of such lines during the flight, is sufficient to allow a rational jury to find that the decedent knew or should have known of the presence of the tap line and should have taken reasonable measures to warn Bleth of the danger. Whether such a warning was made is unknowable, due to the lack of recording from the cockpit at the time of the

crash. However, it is the role of the fact finder, not the Court, to make reasonable inferences from uncertain or conflicting information. *See Anderson*, 447 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

Similarly, in the event that New York imposes a duty on the decedent that applies in this case, the Court is not persuaded by Plaintiff's proximate cause argument. Plaintiff argues that because Bleth had sole control over the helicopter, the decedent could not have been the proximate cause of the accident. (Dkt. 39 at 24-25; Dkt. 58 at 17-18). The passenger's duty—as derived from the horse-drawn carriage, automobile, and motorcycle cases—precludes such an argument. By virtue of being a passenger, the co-occupant of a vehicle does not have control over the vehicle. The passenger cannot make the vehicle speed up, slow down, or turn. Similarly, the passenger in a helicopter cannot force the helicopter to increase or decrease in elevation. However, the lack of control does not relieve a passenger of liability for his own negligence under New York law. New York requires a passenger to take reasonable measures to warn a driver—or, here, a pilot—to avoid an obstacle about which the passenger is aware. The law does not require the passenger to take control of the vehicle. Thus, the decedent's inability to take control of the helicopter would not preclude a jury from finding a failure to warn as the proximate cause of the accident.

Comparative negligence is nearly always a question for the jury. *Nallan*, 50 N.Y.2d at 516-17. Thus, the Court does not question that if New York imposes a duty on

the decedent, then the jury would have to resolve the issue of the decedent's comparative negligence. However, given the sparse legal authority as described above, and the natural oddity of a result imposing a state standard of care on decedent and a federal standard of care on Bleth, the Court is uncertain at this stage as to the legal principles that must be applied. Further briefing and argument may assist the Court in reaching a resolution of these issues, or perhaps the Court will simply have to resolve the issue to the best of its ability based on the limited case law. However, at this stage of the proceedings, the Court exercises its discretion to deny Plaintiff's motion for summary judgment addressed to the comparative negligence affirmative defense without prejudice to the issue being renewed in advance of trial through a motion in limine or otherwise. The Court may ultimately determine that it needs to bifurcate the issue of the decedent's alleged comparative negligence given the paucity of legal authority in this area, so as to appropriately preserve the issue for any potential appeal. These are all issues that will need to be addressed as the case proceeds to trial. But at this juncture, based on the foregoing, the Court denies Plaintiff's motion for partial summary judgment directed to the comparative negligence affirmative defense.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Dkt. 36) is denied, and Defendant's motion for partial summary judgment (Dkt. 42) is granted.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: September 7, 2017
       Rochester, New York